Mankes v. Fandango, LLC Is it Mankes or Mankes? Yes. Ready to proceed, Mr. Biller? Yes, Your Honor. Your Honor, my name is Tony Biller. I represent the appellant Robert Mankes and his appeal of the District Courts Invalidation of U.S. Patent 6477-503 under Section 101 and Alice Grounds. Judge Strato, it's good to be before you again. Judge Wallach, Judge Stoll. Your Honor, this is a Diamond case, specifically the Diamond v. Deere case. Mr. Mankes was a fix-it man for the state of North Carolina, a state employee that was charged with coming in, fixing problems when there's natural disasters or there's problems with inventory. Let me turn to your preemption argument, specifically that there's a lack of preemption. But Intellectual Ventures says that while preemption could signal patent ineligible subject matter, its absence of complete preemption doesn't demonstrate eligibility. If we find that the asserted claims fail under the Alice framework, what good does your preemption argument do? It doesn't, Your Honor. If it fails under the Alice framework, the patent fails under Section 101. Your Honor, the invention in the Blue Brief at 18, you argue that Claim 1, considered as an ordered combination, is more than an abstract idea because steps G, H, and I recite specific steps that enable the local event server to maintain control over local Internet inventory. Those steps simply teach communicating and accepting information. They don't explain how that's accomplished. How is the information communicated and accepted? I think the manner in which the local owner server and the active reservation server communicate the inventory levels is not the subject of the invention. It implements, I think, standard technology in the late 1990s for communications between servers. What you have here, Your Honor, is not- You're on very thin step one ice then. I don't think so, Your Honor. I think when we look at Alice, Alice has to be viewed in light of Deere and in light of Fluke. I think when Alice is construed in light of Deere and light of Fluke, which I think the court intended to have happen, Alice did not replace its jurisprudence on Section 101. I think it attempted to illuminate it in light of further developments in digital software and electronic technologies. Diamond versus Deere and Parker versus Fluke give the necessary backdrop to Alice. In Diamond versus Deere, you take a method for curing rubber. You add a thermocoupler and a digital means for continually monitoring the temperature. The addition of the computer technology improved the process such that they could modify the process to something new. Curing rubber had been around forever. Monitoring the temperatures during curing rubber had been around for as long as they'd been curing rubber. But continually monitoring the temperatures throughout the process allowed them to modify the process more efficiently. A computer was involved. Software was involved. But it was a known algorithm, a known calculation for how to measure the temperature. That wasn't new. What was new was the use of the computer with the thermocoupler led to a better curing process, patentable. Parker versus Fluke, same catalytic conversion methods, same alarm standards, better algorithm. Same method, same process. The only thing that was different was the algorithm or the equation. The equation specifically called out in the claims, not patentable. The only thing that was new in Fluke was the equation. Well, how does that relate to MAICS? If you look at the MAICS system, you have a local event server and an active reservation server. You cannot view this in 2017 eyes. This might seem obvious now, but in 1999, there's nothing in the record showing this was standard technology. How is this different than pure inventory management? Your Honor, pure inventory management, I think what you had was just a pure abstraction claim. I don't recall exactly what the claims read in that patent. No, no. I'm just saying inventory management. In the old days, in engineering, for example, they taught a PERT method of engineering. It was simply a management system. How is this different than what people did by hand? Well, this is different because it didn't exist until Mr. MAICS invented it. This is a specific method for controlling remote inventory. A bit of a back story, Mr. MAICS was a golfer. As part of his passion, he assisted golf courses in selling reservations to the golf courses. What he realized is golf courses had a real hard time with split inventory. The more he looked around, the more he saw what was going on at the State of North Carolina, split inventory was a very old problem in inventory management. Nobody had solved it. You had an inventory that was remote, an inventory that was local, and it led to inefficiencies. You oftentimes had remote inventory was sold out, while there was local inventory still left, or vice versa. He realized with the advent of the Internet and servers that people were rolling out online or digital inventory management, but it was all hub servers, and that's what the prior shows as cited in the patent. He realized that you could add another layer into inventory management. You could leave the inventory managed at a local event server that would control and maintain its inventory. It would allocate it for online sales, but it would determine whether and to what extent that is the local event server would release inventory to external sales. The active reservation server interfaced with the consuming public over the Internet. It regularly updated the event owner server information. It was read-only. It would convey that local inventory information to Internet-based consumers. This was all claimed. It was a communication conduit between the consumer and local event owners. It conveyed the purchase request from the Internet consumer to the event server, and it conveyed acceptance if, in fact, the purchase was accepted. That is not abstract. That is not a concept. It is a specific system for managing inventory, Your Honor, and it is a specific system that solved a problem that had plagued reservation inventory providers or anybody who had an inventory of reservations for movies, for golf courses, that also wanted to use third-party sellers. There had been no solution up to that time. It's a very specifically claimed invention. It's not an abstract idea of using a third-party intermediary and using a third-party intermediary, as you find in Alice, in the normal and accepted process, but replace that third-party with a computer. So we've had at least a couple of different types of abstract ideas involved in our cases. One has something to do with selecting and moving on and even analyzing information. Another has to do with the creation of intangible legal relations, like contracts or property rights. If the innovation here is in either of those kinds of abstract ideas, why does it matter how narrow, or to use your words, specific, that innovation in abstract ideas is? Your Honor, I can only frame your question in the context of the precedent that comes to my mind, and what comes to my mind when you say that are Benson and Bilski. Benson was an abstract concept. I think it was novel for the conversion of basically digital numbers. I think it was a novel concept, but it was simply automated, and the only thing that was called out in the patent was an abstract, novel concept. Very, very narrow, changing decimal binary representations. Very narrow, but at the end of the day, it was an abstract concept that was claimed to be processed. And the Supreme Court in Mayo, among other things, says, once you're in the ineligible side of the line, it doesn't really matter how narrow the work you're doing over there is. What you need to do is cross the line and do some inventive work on the eligible side of the line. And it seems to me what you're talking about here is saying that in the creation of economic relations and the use of information passing around to create those, you've done something narrow and innovative, but I don't know that that counts. If he had claimed using an intermediary to manage inventory and communicating with that intermediary, if it had been claimed at a high level of abstraction, I think you're closer to Alice. I think you're in Bilski. I'm sorry, in Benson, but that's not what is claimed. He claimed a specific system for using servers with described roles, for communicating within that system. Do you have a different argument for claim one, which is a method? No, Your Honor. Okay. Your Honor, I see I'm down to five minutes. You can reserve your time. Reserve my remaining time. Thank you, Your Honor. Ms. Davis? May it please the Court, Your Honor? The district court here properly dismissed Manx's claims based on this court's instructions for how to review claims with respect to 101 at the Rule 12 stage. Here, Manx has admitted many of the facts that are relevant to the 101 inquiry. In fact, this morning at this argument, Manx admits that his invention is implemented using standard technology for communicating information and standard computers. In the briefing and here this morning, Manx admits that this was a standard business problem that had arisen well before the development of computer technology with inventory management. He was trying to solve a business problem, and he chose an abstract way to solve that problem, which is having the local owner, the person who has the tickets or the reservations or the golf tee times, control and keep track of how much inventory is left, rather than having the person who's selling it on the Internet keep track of how much inventory is left, and rather than having each entity have its own separate inventories. In solving that business problem, he admits that the computer architecture in the briefing, he admits that that computer architecture that's used in the invention is the exact same computer architecture that is used in the prior art reservation systems. He discusses that in his reply brief at page 3. As the district court properly found, there are no factual allegations made in Manx's complaint at all with respect to improving computer functioning, improving computer technology, or really any technological improvement whatsoever. And there's really nothing in the specification that suggests that this invention improves the computers, improves any technological functioning. In fact, the specification is replete with references to the fact that it is using standard computers, off-the-shelf technology, conventional Internet connections, and conventional inventory management programs for each industry that's involved. There's really no argument, and I don't think Manx is making the argument, that there's any technological improvement represented by this invention. There are no claim construction issues that have been raised, either below or before this court. And so I think this is, under the framework of this court's cases, recently addressing the issue of when dismissal is proper under Rule 12, such as the Atrix case and the Berkheimer case, this is one of those cases that is way over on the side where all the factual issues are not in dispute, and the patentee is not raising any factual issues that need to be resolved before determining patentability. If we just go quickly through the Alice analysis here, as Your Honor already pointed out, this is an abstract idea. Inventory management is an abstract idea. It's an old abstract idea. The invention here falls squarely within the two categories that I believe it was Judge Toronto talked about in terms of the types of abstract ideas this court sees. It deals with moving information around, adjusting data, and it deals with communicating that information. And it deals with issues of the legal relationships, and it deals with the legal relationships between who's in charge, which of these business parties is in charge of keeping track of the inventory. Is it the local owner or is it the centralized system that keeps track of the inventory? Your friend argues that this is innovative. Well, Your Honor, first of all, I think this court's law is clear that whether you have innovation, if it's just an innovation in an abstract idea, a fundamental abstract idea as what we're addressing here, that is not enough to confer patentability. I mean, if that were so, the argument would always be about the novelty of the abstract idea, and that's not what the case law of this court and the Supreme Court teaches. This is very analogous to the situation in Alice, where it was very similar types of steps. And in that case, the court found that electronic record keeping, such as we have here, where you're taking data, you're adjusting that data, and you're communicating about that data, is an unpatentable abstract idea, and there's no suggestion. You could do it with a pencil and paper. You could do it with a pencil and paper. In fact, here, Your Honor, in the patent specification itself, at column two, let me find my, in column two in the specification itself, or actually in column one at the bottom in lines 48 to 52, the specification discusses the fact that you could do this type of invention with making phone calls to the other side. Phone call or pencil. That's right. It says, you know, in the old days, before we had computers, you could adjust the inventory by calling up the central reservation service and saying, do you have any more or I need some more here, but that was clumsy and difficult because you had to make a phone call. Now we have computers, we can use computers. And that exact kind of computers make things easier in a generic sense that this court and the Supreme Court has repeatedly said does not confer eligibility on an abstract idea. And then finally, when we talk about the inventive concept analysis at the second step, again, Manx has conceded that we're dealing with standard technology here and has not articulated any way in which any of the technology is being used in a non-conventional manner, in a non-routine manner. There's really no dispute that that's what we have here. So based upon all of the admissions of Manx, based upon the specification and the patent and the district court's analysis that Manx had made no factual allegations that would support a finding that this invention is non-abstract or is otherwise patent eligible, we think this is a pretty straightforward application of the Alice analysis and was properly dismissed at Rule 12. Any further questions? And I'll yield the rest of my time. Thank you, Ms. Davis. Mr. Biller? Your Honor, thank you. Manx did not concede that the invention at issue is standard technology. We conceded that the methods that the servers communicated with each other were standard and known in the art. We also do not concede that an inventory management system is not technical. We believe that Fandango misconstrues Alice. Alice did not end its conclusion saying it's an abstraction, it's a mere concept, and therefore not patentable. Alice rests on the predicate that once you took out the digital technology, all that was left was the known intermediated settlement method. There was nothing new in Alice once you extracted out the digital technology. In contrast, like in Deere, when you extract out the standard communication protocols, you're still left with a new method that did not exist prior to Manx, a way for selling remote inventory and having it communicate directly. I just want to make sure I understand the methodology you're recommending here. It sounds like you're saying that you're supposed to take out the technological steps and then look and see if what's left is new and novel. The technical by itself, using technology in a new context, doesn't carry the day. But if the technology creates a whole new system, or at least an improved system, like you have in Deere, it is patentable. And I suggest to this panel that's exactly what Deere stands for. That's the difference between technological and innovation. It is the configuration of these servers, an active reservation server and a local event server, to control the inventory in the way laid out in the claims. How do you change the computers? How do you change the computers? It does not change the computers. It's an inventory management system. We would suggest an inventory management system is as technical and as an important part of technology and industry as computers themselves. I mean, Amazon, Walmart, Fandango. How do you deal with the telephone and the pencil? You could not do this with a pencil. You perhaps could have done it with a telephone, although I don't think it's... I don't. There's nothing in the art showing this was done. You have several... I don't think it was routinely. There's no evidence this was done by telephone. Column 1 seems to say it. What's that? Column 1 seems to say it. Column 1? That it was done, albeit inefficiently. In 1990... I think it says they allocated to resellers. They conveyed the tickets out. It doesn't say that they were in regular communication. If column 1 said that the intermediary was regularly calling back to the local event server, I don't think column 1 says that. It talks about resellers. You're saying this where it says reallocation of central inventory is difficult and requires manual intervention through conventional communication sources. You're saying the difference here is it doesn't say that you repeatedly have to do it after each sale? I don't think it was done after each sale. I think the standard was the resellers were literally reselling. I think that's what the... Either that or everything was sold from a central hub. There was only one server. And so they just weren't addressing the problem that there might be two different sources selling the same thing? Yes, Your Honor. Anything further, Counsel? No, Your Honor. Thank you. Thank you. The matter will stand submitted.